UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NOELLE-MARIE HARRINGTON,<br>by her mother and next friend,<br>CORRINE HARRINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ATTLEBORO, RICHARD<br>GEORGE, DOUGLAS SATRAN, PATRICIA<br>KNOX, MARK DONNELLY, JEFFREY<br>NEWMAN and ELIZABETH YORK,<br><br>Defendants. | Case No: 15-cv-12769-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                                             **January 17, 2018**

### I.     Introduction

Plaintiff Noelle-Marie Harrington ("Noelle"), by her mother and next friend Corrine Harrington ("Corrine"), has filed this lawsuit against Defendants City of Attleboro ("Attleboro"), Richard George ("George"), principal of Brennan Middle School, Douglas Satran ("Satran"), principal of Brennan Middle School, Patricia Knox ("Knox"), an assistant principal of Brennan Middle School, Mark Donnelly ("Donnelly"), an assistant principal of Brennan Middle School, Jeffrey Newman ("Newman"), principal of Attleboro High School, and Elizabeth York ("York"), an assistant principal of Attleboro High School. Plaintiff's remaining claim alleges a violation of Title IX, 20 U.S.C. § 1681 against Attleboro (Count I). D. 8. Attleboro has moved for summary

1

judgment. D. 54. For the reasons stated below, the Court DENIES the motion for summary judgment.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III. Factual Background

The following material facts are undisputed unless otherwise noted. Noelle attended Brennan Middle School in Attleboro ("BMS") for sixth through eighth grades. D. 62, ¶ 33.[1]

---

[1] The Court hereinafter refers to the material facts asserted by Attleboro, D. 56, and Plaintiff, D. 62, by referring to the reproduction of Attleboro's statement of material facts and Plaintiff's responses thereto in D. 62.

2

Noelle is 5'11" and weighs over 200 pounds, making her one of the biggest students in her class. D. 62, ¶ 34. In seventh grade, Noelle began telling certain friends that she "like[d] girls." D. 62, ¶ 35. Noelle attests that her sexual preference became well-known by her classmates at that time. D. 62, ¶ 36.

### A. Seventh Grade

In seventh grade, two brothers in Noelle's class ("Chris H. and Cam H.") asked her out on a date. D. 62, ¶¶ 37-41. When she declined, explaining that she did not like boys, they called her a "dyke" and "fag." Id. The parties dispute whether Noelle reported this and other harassment. Attleboro state that Noelle never reported the incidents, and Plaintiff offers deposition testimony by Knox, as well as Noelle's testimony that she told a teacher, who told her to ignore it, and that this and other events were known to George, Satran, Knox, Donnelly and other individuals at BMS. D. 62, ¶¶ 43, 51, 53, 62, 65.

Noelle faced verbal and physical harassment by another boy in seventh grade ("Tommy C."), who on multiple instances punched and tripped her. D. 62, ¶¶ 44-45, 54-55, 61-64, 66-67. Noelle testified that on at least one of these instances, Tommy C. punched her after she refused his "sarcastic" requests that she date him, calling her a "dyke" when she declined. D. 62, ¶ 45. Knox investigated one of these punching incidents, first meeting with Noelle and Corinne, and after Tommy C. denied the allegations, referring the dispute to the school psychologist for peer-to-peer mediation. D. 62, ¶¶ 46-50. Noelle was also referred to the school psychologist for similar peer-to-peer mediation when Tommy C. twisted her arm, possibly breaking it, and then in ninth grade when they were again placed in the same class, poked her during class and resumed his verbal harassment. D. 62, ¶¶ 82-84. Knox also investigated an allegation that Tommy C. had tripped Noelle, causing her to break or otherwise injure her wrist, though the nature and extent of

3

the injury is in dispute. D. 62, ¶¶ 56-59. While BMS administrators said that evidence of such an injury would have resulted in a serious response, D. 62, ¶ 59, documents showing that Noelle had either broken or severely sprained her wrist, requiring a cast, were a part of Noelle's school records, D. 62, ¶¶ 58-60. Knox later investigated another allegation that Tommy C. pushed Noelle down the stairs, but testified that when other school administrators did not know anything about the event, the investigation did not proceed further or result in any punishment. D. 62, ¶ 69. Plaintiff offers Noelle's testimony that she told the school nurse on at least one occasion about the tripping, as well as Knox's testimony and nursing records showing that Noelle had told the school nurse the source of her injuries. D. 62, ¶¶ 65, 68.

Corinne met with Knox several times to discuss the bullying, who told Corinne that she would handle the incidents but could not provide particular details on disciplinary outcomes for privacy reasons. D. 62, ¶ 79. The BMS teachers knew bullying is not allowed generally and Corinne was told they would "keep an eye out if they saw anything." D. 62, ¶ 80.

Noelle asked her seventh-grade teachers to change her seat assignment to keep her away from Tommy C., explaining that he was harassing her. D. 62, ¶ 71. Some of Noelle's teachers changed her seating, but others refused. D. 62, ¶ 72. Despite being spoken to by BMS administrators, Corinne testified that Tommy C. continued to harass Noelle verbally, though no subsequent event was witnessed by any teachers. D. 62, ¶ 81. BMS ultimately changed Noelle's schedule so that Tommy C. was no longer in the same class as her. D. 62, ¶ 86. Plaintiff offers Knox's testimony that Tommy C. was never disciplined. D. 62, ¶ 88.

**B.  Eighth Grade**

The next school year, BMS did not place Noelle in the same class as Tommy C. D. 62, ¶ 90. However, on at least two instances in eighth grade, Corinne reported verbal harassment,

including Noelle again being called "dyke," "faggot" and other similar terms. D. 62, ¶ 92. Donnelly, who was responsible for discipline for the eighth grade at BMS, did not have any interactions with Noelle beyond filing a petition related to her poor school attendance and appearing in juvenile court in support of that petition. D. 62, ¶ 93.

In Attleboro, at the end of each school year, there is a transition meeting between BMS and Attleboro High School ("AHS") officials to discuss the transition from middle school to high school, and to pass on information about particular students' disciplinary or behavioral issues of concern to administrators. D. 62, ¶¶ 95-96. It is disputed whether Noelle and her alleged harassers were discussed at the transition meeting, and Plaintiff points to the testimony of several school officials, including Donnelly, Knox and others, that there was neither a discussion of Noelle and her alleged abusers nor a transfer of administrative records relating to Noelle's harassment. D. 62, ¶ 96.

### C. Ninth Grade

Noelle joined the Gay-Straight Alliance club when she started at AHS. D. 62, ¶ 101. Noelle did not experience any harassment during her first semester at AHS, but in February of ninth grade, Noelle was placed in the same class as Tommy C., which had not happened since part-way through seventh grade. D. 62, ¶¶ 104-06. Over the course of approximately one week, Tommy C. poked Noelle during class and whispered the same slurs at her, including "dyke, fag, whore, slut, bitch" and adding that "the world would be better off without [Noelle]." D. 62, ¶¶ 105-06. The classroom teacher moved Tommy C.'s seat to a different location in the classroom,

5

after which he did not make any other harassing statements or acts. D. 62, ¶ 107. York instructed him not to bother, touch, or comment on Noelle. D. 62, ¶ 108.[2]

York assembled a team of administrators to respond to any future issues raised by Noelle or Corinne. D. 62, ¶ 115. The parties dispute the impact of this team on the harassment, and Plaintiff offers the testimony of Noelle's dean, Ann Montagano ("Montagano"), that many incidents of harassment endured by Noelle were not appropriately brought to her attention, and the testimony of Lamore, the school psychologist, who did not see Noelle at all in high school despite York's testimony that she had instructed him to check-in with Noelle on a daily basis. D. 62, ¶¶ 115-18.

Later in ninth grade, a girl Noelle described as her friend called her slurs such as "slut," "whore," and "fat ass" on multiple occasions. D. 62, ¶ 120. Noelle reported the name calling after one or two weeks, after which it stopped. D. 62, ¶ 121.

### D. Tenth Grade

In tenth grade, Noelle was harassed by another boy ("Andrew M."), and had panic attacks as a result of sitting next to him in class. D. 62, ¶ 127. The parties dispute when Noelle began having panic attacks. Id. As a part of her continuing exploration of her sexuality, Noelle began identifying as gay or lesbian when she was sixteen years old in the tenth grade. D. 62, ¶ 130.

Other students continued to harass Noelle. One student told her that he did not like gay people, using insults and slurs including "dumb" and "nerd," and upon learning that Noelle identified as a lesbian, "dyke" and "fag." D. 62, ¶ 136. After Noelle was allowed to change seats

---

[2] The parties dispute whether York or other administrators knew about the full extent of this incident, whether the harassment happened at all and whether Noelle recanted the accusation, wholly or partially. D. 62, ¶¶ 108-13. The parties point to conflicting deposition testimony on this point.

in the class to avoid this student, he continued to approach her table to tell her she was "ugly and stupid and fat." D. 62, ¶ 137. When Noelle was on crutches, another student told her the reason she needed the crutches was because of her weight. D. 162, ¶ 138. Noelle testified that she attributed this harassment to a student who was friends with Noelle's ex-girlfriend, and that this may have been the cause of the animus in that instance. D. 162, ¶¶ 139-140. Noelle reported this incident to York; and Montagano testified that York's investigation did not advance beyond interviewing Noelle or the harassing student, and by her own admission the investigation did not follow her usual practice of inquiring "until she came to a dead end or exhausted all possibilities." D. 62, ¶ 141.

In January of tenth grade, Noelle began refusing to go to school. D. 62, ¶ 145. Attleboro points to the high school counselor, Susan Sherck's testimony that Noelle was avoiding school due to her crutches, while Plaintiff relies upon York's testimony recalling that Noelle had recently been called "whore" and "pig" by fellow students at the mall. Id. AHS implemented a "safety plan" to allow Noelle to feel safer at school, although the parties dispute the value of the plan. D. 62, ¶ 147. In particular, Plaintiff points to Sherck's testimony that the safety plan was focused on bullying Noelle experienced in the hallways and, therefore, focused its solutions on her ability to safely travel around the school. Id. Noelle testified that she was harassed despite the implementation of the safety plan, including by Tommy C., who continued with the name-calling, and on at least one occasion, followed Noelle's brothers home from school and trespassed on their home's property. D. 62, ¶ 156.

The AHS administration referred Noelle to outside counseling services, and provided in-school counseling. D. 62, ¶ 153. The parties dispute the quantity and quality of these services.

7

Noelle began doing her school work in Montagano's office, as she continued to have panic attacks in school. D. 62, ¶ 154.

Noelle was again harassed in class when Andrew M. shined a laser pointer in her eyes. D. 62, ¶ 158. Plaintiff offers evidence that after Andrew M. was suspended for this conduct, his friends called her a "snitch" and said that "the world would be better off without dykes like her in it." D. 62, ¶¶ 158, 165. Noelle testified that she had seen one of these students carrying a binder which had "death to all queers" written on the cover. D. 62, ¶ 77. Plaintiff points to Sherck's testimony that at this stage, Noelle was experiencing daily panic attacks and no longer wanted to attend school. D. 62, ¶ 158. On February 24, 2012, Noelle made a post on her Facebook account contemplating suicide in response to the harassment. D. 62, ¶ 169. After Corinne brought Noelle to AHS to seek assistance, the parties dispute the degree to which school administrators were helpful in recommending appropriate remedies to Noelle's suicidal ideations. D. 62, ¶¶ 170-78. Noelle was treated every day for eight days on an outpatient basis at a crisis center. D. 62, ¶ 179. Ultimately, Noelle chose to pursue a G.E.D. rather than return to AHS. D. 62, ¶ 180.

## IV. Procedural History

Plaintiff instituted this action in Bristol Superior Court. D. 8. Defendants removed the action to federal court on June 23, 2015 and, soon thereafter, filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). D. 12. The Court allowed the motion in part, dismissing Plaintiff's claims under 42 U.S.C. § 1983 as well as various state law claims for negligence, violation of the Massachusetts Declaration of Rights, violation of the right to be free from sexual harassment in receiving public education, violation of the right to be free from sexual discrimination in a place of public accommodation, and violation of the Massachusetts Equal Rights Act. D. 31. Only

Plaintiff's claim under Title IX against Attleboro remains. The Court heard the parties on the pending motion and took this matter under advisement. D. 67.

V. Discussion

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To state a claim under Title IX for student-on-student sexual harassment, a plaintiff must show "(1) that he or she was subject to 'severe, pervasive, and objectively offensive' sexual harassment by a school peer, and (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits, . . . (3) [the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." Porto v. Town of Tewksbury, 488 F.3d 67, 72-73 (1st Cir. 2007). For sexual harassment to fall within the gambit of Title IX, it must have been because of the plaintiff's sex. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Attleboro only disputes (i) whether Noelle's harassment constitutes sex discrimination; and (ii) whether their response was deliberately indifferent.

A. Sex Stereotyping Based On Sexual Orientation Can Support A Sex Discrimination Claim Under Title IX

The Court held in its decision on Defendants' motion to dismiss that the complaint stated a Title IX claim under either a sex or sex stereotyping theory. D. 31 at 7-9. Attleboro renews substantially the same argument, contending that Noelle's harassment relating to her sexual orientation cannot support a claim under Title IX on a sex stereotyping theory. Attleboro's argument remains unavailing. Sex discrimination can be based on sex stereotypes. See, e.g., Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 909 (1st Cir. 1988). Actionable sex stereotypes

include those based on sexual orientation. See J.R. v. New York Cty. Dept. of Ed., No. 14-cv-0392-ILD-RML, 2015 WL 5007918, at *6 (E.D.N.Y. Aug. 20, 2015); Centola v. Potter, 183 F. Supp. 2d 403, 408-10 (D. Mass. 2002); Snelling v. Fall Mountain Reg'l Sch. Dist., No. 99-cv-448-JD, 2001 WL 276975, at *4 (D.N.H. Mar. 21, 2001); cf. Rosa v. Park W. Bank & Tr. Co., 214 F.3d 213, 215–16 (1st Cir. 2000). Stereotypes about lesbianism, and sexuality in general, stem from a person's views about the gender roles of men and women, and the relationships between them. Videckis v. Pepperdine University, 150 F. Supp. 3d, 1151, 1160 (C.D. Cal. 2015). Discrimination based on a perceived failure to conform to those gendered stereotypes constitutes actionable discrimination under Title IX. Id. at 1160-61.

Other courts facing similar questions have found that sexual orientation can form the basis of a sex stereotyping discrimination claim under Titles VII or IX. Most recently, the Seventh Circuit in Hively v. Ivy Tech Cmty. Coll. of Indiana, 853 F.3d 339 (7th Cir. 2017) (en banc), held that discrimination on the basis of sexual orientation is a form of sex stereotyping discrimination under Title VII.[3] Id. at 351-52. In Hively, the plaintiff was an adjunct professor on a college campus. Id. at 341. She alleged that between 2009 and 2014, she was rejected from at least six full-time positions due to her sexual orientation. Id. The Court considered two analytical frameworks for identifying the relationship between sexual orientation discrimination and sex discrimination. Id. at 345. Analogous here, the court considered the "comparative method," in which the court isolated the significance of the plaintiff's sex to the defendant's decision; in other words, holding all other things constant and changing only the plaintiff's sex, would she have

---

[3] The Seventh Circuit has since applied its holding in Hively to a Title IX stereotyping claim. See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034 (7th Cir. 2017).

10

endured the same harassment? Id. The court concluded that this but-for analysis showed that the defendant's conduct was "paradigmatic sex discrimination"; in other words, that the plaintiff faced the discrimination because she was a woman. Id. at 345-46; see Boutillier v. Hartford Public Sch., 221 F. Supp. 3d 255 (D. Conn. 2016); Videckis, 150 F. Supp. 3d at 1154. The comparative method makes clear what other courts had already explored, that "[t]he gender stereotype at work here is that 'real' men should date women, and not other men," and that the converse is equally true and actionable under Title VII or IX. Centola, 183 F. Supp. 2d at 410.

Attleboro's citations in support of their contention that such a claim is not cognizable under Title IX are not persuasive. For example, it cites to Tyrrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 2d 601 (E.D.N.Y. 2011), where the court held that the plaintiff's claims were based upon her perceived lesbianism and/or bisexuality, and therefore, not cognizable under Title IX. Tyrell, 792 F. Supp. 2d at 623. There, however, the court did not consider the comparative method to identify sex discrimination as now laid out by Hively, nor did it inquire in any other manner beyond relying upon Second Circuit precedent. See id. at 622-23.

Furthermore, the plaintiff in Tyrell did not alternately plead a theory of discrimination by sex stereotyping, see id. at 623, which the Second Circuit has held can support a claim for harassment on the basis of sexual orientation-related gender stereotypes. See Christiansen v. Omnicom Grp., Inc., 852 F.3d 195, 199-201 (2d Cir. 2017); J.R., 2015 WL 5007918, at *6 (holding that bullying based on male plaintiff's feminine mannerisms supported a Title IX claim). Noelle has alleged a sex stereotype theory in this case, and the Court has already held that such a theory is sufficient to state a claim for sex discrimination under Title IX. D. 31 at 7-8. Attleboro relies upon additional cases that do not involve harassment relating to sexual orientation, seeking to contextualize Noelle's harassment as akin to any other crass name-calling. Given the nature of the

11

Title IX claim here and the disputed record of facts giving rise to that claim, the Court does not find these citations persuasive here.[4]

Accordingly, the Court reaffirms that Plaintiff's claim of sex discrimination relating to Noelle's perceived or actual sexual orientation are cognizable as a sex stereotyping theory under Title IX.

### B. Plaintiff Has Shown a Triable Issue of Fact of Peer-on-Peer Sexual Harassment

#### 1. *Severe, Pervasive, and Objectively Offensive Sexual Harassment*

Attleboro contends that Noelle's harassment does not constitute sex-based harassment. In particular, Attleboro argues that (i) Noelle's harassment based on her sexual orientation is not sex-based; (ii) verbal teasing related to her weight and height are not sex-based; and that (iii) any physical assault she endured was not accompanied by sex-based expressions of intent, and thus are not sex-based. Attleboro's arguments are unavailing.

First, beginning in the seventh grade, Noelle recalled being bullied by twin brothers at school, including calling her "dyke" in response to her refusal to go on a date with the boys "because she didn't like boys." D. 62, ¶¶ 40-41. Such targeted language alone has been sufficient to show sex discrimination. Bowe v. Eau Claire Area Sch. Dist., No. 16-cv-746, 2017 WL 1458822, at *3 (W.D. Wis. Apr. 24, 2017) (holding that the Plaintiff had alleged a peer-harassment

---

[4] For example, Attleboro relies upon Morgan v. Town of Lexington, 823 F.3d 737, 745 (1st Cir. 2016) and Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002). However both Morgan and Frazier can be distinguished from this case in several ways. First, in Morgan, the words used against the plaintiff were not gendered or targeted towards his perceived sexual orientation, whereas Noelle was repeatedly subjected to sexually offensive slurs. Second, there was no allegation of any sex or gender-based animus against the plaintiff by any of his fellow students in Morgan, nor by the discipline matron in Frazier, while the record here contains evidence could be found to show that Noelle was targeted because of her gender and sexual orientation.

claim under Title IX because the consistent pattern of gender stereotype slurs used against the Plaintiff, including "fag," "bigot," "bitch," and "pussy," made it easy to infer that his classmates harassed him because of his failure to adhere to traditional gender stereotypes, which constituted as discrimination on the "basis of sex").[5]

Furthermore, evaluating the evidence in context, the Court believes that a factfinder could reasonably infer that instances of Noelle being asked on dates were necessarily intertwined with her gender and sexual orientation, and further instigating incidents that led to more severe harassment. With respect to the seventh grade incident described above, Noelle testified that her refusal to go on a date was because she did not "like boys," which then escalated to calling her "dyke" and "fag." D. 62, ¶¶ 37, 40-41. Attleboro asks the Court to parse Noelle's incidents of harassment, such that any one of them, even rising to physical assault, is not sex-based if it was not directly accompanied by the appropriate slurs expressing animus. That would be improper because "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' [] 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651 (1999) (quoting Oncale, 523 U.S. at 82). Similarly, much of the bullying Noelle endured relating to her weight and appearance cannot be viewed outside the context that some of the same tormenters interspersed calling her "ugly and stupid and fat" with calling her "dyke" or fag." See, e.g., D. 62, ¶¶ 136-37.

Noelle also testified that one of the instances, in which she was punched in the stomach, came immediately after refusing "sarcastic" requests to date Tommy C., who in turn also referred

---

[5] Attleboro's other case citations in support of its argument otherwise do not compel a different conclusion as to its summary judgment motion where the disputed facts here, when viewed in light of the non-movant, support a Title IX claim, as explained above. See, e.g., Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 165 (5th Cir. 2011);

13

to her as a "dyke" upon her refusal. D. 62, ¶ 45. Noelle testified that Tommy C. physically assaulted her on several other occasions, in some instances with evidence in the record indicating an alternative motive, and some with no stated motive at all. D. 62, ¶¶ 54, 61, 63, 66. Noelle was placed in the same class as Tommy C. in the ninth grade, and for a week before being moved away from Noelle, he resumed calling her derogatory names, fairly characterized as invoking reference to her sexual orientation and/or gender and touched her without permission during class. D. 62, ¶¶ 104-06; see Doe v. Galster, 768 F.3d 611, 617 (7th Cir. 2014) (recognizing previous holdings that, in the employment context, "gendered words like bitch and whore . . . can be strong evidence that the harassment at issue is on the basis of sex").

Finally, Andrew M., whose friend directed a laser pointer at Noelle's eye in class and was suspended as part of that underlying incident, D. 62, ¶¶ 158, 161, reacted to his friend's suspension by proclaiming that "the world would be better off without dykes like [Noelle] in it." D. 62, ¶ 158. Noelle testified that she had separately seen the same boy holding a binder which had "death to all queers" written on the cover. D. 62, ¶ 77. Noelle testified that when she was in the eighth grade, she was again called "dyke," "faggot," and "other sexually offensive terms" on multiple instances. D. 62, ¶ 92.

The record includes admissible evidence supporting Plaintiff's position that Noelle was subjected to "wide-spread peer harassment" and physical assault because of stereotyping animus focused on her sex, appearance, and perceived or actual sexual orientation. Snelling, 2001 WL 276975, at *5; see Videckis, 150 F. Supp. 3d at 1160–61. Accordingly, Plaintiff has offered evidence that would allow a reasonable factfinder to determine was severe, pervasive, and objectively offensive sexual harassment.

## 2. *Deliberate Indifference*

Deliberate indifference is "a stringent standard of fault" that requires proof that a plaintiff "disregarded a *known or obvious* consequence of his action or inaction." Porto, 488 F.3d at 73 (emphasis in the original) (quotation mark omitted) (quoting Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 410 (1997)). A Title IX claim that "the school system could or should have done more is insufficient to establish deliberate indifference." Porto, 488 F.3d at 73. The First Circuit has suggested that a school might be deliberately indifferent if it had notice of sexual harassment or discrimination and did nothing or failed to take additional measures after its initial measures were ineffective. See id. at 74 (citing Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999)).

Although it is a closer issue, there is a genuine issue of material fact as to whether Attleboro was deliberately indifferent to Noelle's peer-to-peer sexual discrimination. While it did take some remedial steps after some of the instances of harassment, the inconsistency of the responses, the dismissal of Noelle's complaints out-of-hand by some teachers without escalating the issue to appropriate administrators, and the failure to deploy a response and strategy across Noelle's school years could allow a rational jury to conclude that the response was "clearly unreasonable in light of the known circumstances." Thomas v. Springfield Sch. Comm., 59 F. Supp. 3d 294, 302 (D. Mass. 2014). The court in Thomas, 59 F. Supp. 3d at 304, concluded that the school's response "demonstrate[d] a complete lack of concern" about the harassing conduct and allowed reoccurrence of the harassment "without raising the suspicions of those teachers responsible for supervising them" given the prior history. Id.

In this case, a reasonable factfinder could conclude that some instances of harassment in the record were met with no response at all, constituting deliberate indifference. For example, Noelle reported instances of the sex and sexual orientation-based name-calling in seventh grade to

15

a teacher, and the teacher told her to ignore it.  D. 62, ¶ 43.  Furthermore, after a series of instances when Noelle was tripped in the hallway, including when on crutches from a car accident, Knox's investigation did not result in any remediation after other administrators denied knowledge of the event.  D. 62, ¶¶ 61-69.  Finally, Noelle has offered evidence that Knox had directed administrators to punish student infractions for using hate speech, including the slurs used against Noelle, with warnings to parents rather than punishment ranging from three days of suspension to possible expulsion as recommended in the school's code of conduct for students.  D. 62, ¶ 22.  From these facts, a reasonable factfinder could conclude that Attleboro in some instances demonstrated a complete lack of concern for addressing Noelle's harassment.

A reasonable factfinder could also conclude that other instances of harassment in the record occurred when Attleboro failed to take further steps in the wake of an initial, inadequate response. For example, when Noelle told teachers about the instances when she was punched in seventh grade, one of the teachers accused her of lying.  D. 62, ¶ 45; see id., ¶¶ 43, 51, 137.  Knox's investigation of the incident resulted in a referral to the school psychologist for mediation between Noelle and her alleged attacker.  D. 62, ¶¶ 48-50.  When Tommy C. was put in the same class as Noelle again for ninth grade, where he again called her offensive sex and orientation-related slurs and poked her during class, Knox's investigation again resulted in mediation.[6]  D. 62, ¶¶ 83-84. Thus, even if the "measures were timely and reasonable," they can still amount to deliberate indifference, precluding summary judgment.  Canty v. Old Rochester Reg'l Sch. Dist., 66 F. Supp.

---

[6] Furthermore, with respect to mediation organized by Knox and used in sporadic attempts to resolve some of the incidents of harassment, there is a further question of fact regarding whether these responses were deliberately indifferent in and of themselves.  Knox's own administrators testified that they did not always meet with Noelle when they should have, D. 62, ¶ 118, and others characterized their sporadic meetings and responsibilities as "put[ting] a Band-aid on their situation."  D. 62, ¶ 153.

2d 114, 116–17 (D. Mass. 1999). Based on these disputed facts, a factfinder could determine that Attleboro was, by omission or inadequacy, deliberately indifferent to a pattern of bullying and physical assault that had the known or obvious consequence of making the school environment so unbearable that, at best, Noelle never returned to the Attleboro school system again, or at worst, considered committing suicide.

Cases relied upon by Attleboro are not analogous to this case. Morgan, 823 F.3d at 737, does not directly address deliberate indifference, and the alleged discrimination in that case–lacked the "constellation of surrounding circumstances" involving homophobic slurs and other harassment that the court contemplated might have been sufficient. Morgan, 823 F.3d at 745-46 (quoting Carmichael v. Galbraith, 574 Fed. App'x 286, 290 (5th Cir. 2014) (per curiam)). In Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 178 (1st Cir. 2007), rev'd on other grounds, 129 S. Ct. 788, 792, 798 (2009), the school attempted to remediate the harassment not only by investigating, but also by offering to place the harassed student in a new school bus assignment, where the harassment had occurred. Id. at 169-70. The First Circuit held that the response was not "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Id. at 175.[7] However, in that case, the school administrator responsible for handling such claims responded swiftly upon initial reports, escalated his investigation upon discovering the harassment may have been more severe than he had initially understood and responded to the victim's continuing distress at school by issuing a memorandum to the entire

---

[7] The Court is not persuaded otherwise by Attleboro's reliance upon cases concluding otherwise where those cases did not involve similar circumstances, even as disputed. See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1122 (10th Cir. 2008) (relying on police investigation rather than interviewing witnesses according to policy was not deliberate indifference); Oden v. N. Marianas Coll., 440 F.3d 1085, 1089 (9th Cir. 2006) (violating time deadlines of harassment policy was not deliberate indifference).

17

school staff instructing that he be informed if the victim was observed crying or committing disciplinary infractions. Id. In this case, however, Plaintiff has raised "competent evidence" that the school's response to her harassment "was bungled." Id. Accordingly, Plaintiff has also demonstrated that there is a triable question of fact as to whether Attleboro was deliberately indifferent.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Attleboro's motion for summary judgment, D. 54.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge